**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS, FLORIDA**

**JOSE ANDRADES,**
    **Plaintiff,**

**-vs-**                                   **CASE NO. 2:09-cv-580-FtM-DNF**

**MICHAEL ASTRUE, Commissioner**
**of Social Security,**
    **Defendant.**
_____/


**OPINION AND ORDER**[1]

Plaintiff, JOSE ANDRADES, appeals to the district court from a final decision of

the Commissioner of Social Security [the "Commissioner"] denying his application for

social security disability, disability insurance benefits (sections 216(I) and 223 of the Social

Security Act) and Supplemental Security Income (1614(a)(3)(A of the Social Security Act).[2]

Plaintiff filed applications for a Period of Disability and Disability Insurance

Benefits and Supplemental Security Income (SSI) on June 26, 2006, and October 13, 2006,

respectively; alleging an onset date of July 2, 2005 (Tr. 10, 85-87, 88-90). Plaintiff filed a

request for reconsideration on April 10, 2007 (Tr. 45). These claims were denied initially on

February 6, 2007, and on Reconsideration on May 1, 2007 (Tr. 10, 37-40, 41-44). Plaintiff

---

[1]    Both parties have consented to the exercise of jurisdiction by a magistrate judge,
and the case has been referred to the undersigned by an Order of Reference
signed by District Judge Charlene E. Honeywell on October 19, 2010. (Tr. 20).

[2]    Because the disability definitions for DIB and SSI benefits are identical, cases
under one statute are persuasive as to the other. *Patterson v. Bowen*, 799 F.2d
1455, 1456 n.1 (11th Cir 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2
(11th Cir. 1986).

1

filed a Request for a Hearing before an Administrative Law Judge (ALJ) on June 1, 2007

(Tr. 10, 53). Plaintiff meets insured status through December 31, 2010 (Tr. 12, Finding no.

1). ALJ Irwin Bernstein held a video hearing from West Palm Beach, Florida while Plaintiff

and his Counsel were in Ft. Myers, FL (Tr. 10-18, 19-32).  Plaintiff filed a Request for

Review of the Hearing Decision by the Appeals Council on June 25, 2009 (Tr. 5-6). The

Appeals Council denied Plaintiff's request for review on August 7, 2009 (Tr. 1-3). The ALJ's

decision became the final decision of the Commissioner. Under 42 U.S.C. § 405(g), Plaintiff

requests judicial review of the Commissioner's final decision.

 The Commissioner has filed the Transcript of  the proceedings (hereinafter referred

to as "Tr." followed by the appropriate page number), and the parties have filed their legal

memorandums.  For the reasons set  forth below, the Court finds that the Commissioner's

decision is due to be **REVERSED** and **REMANDED**.

### I.     Social Security Act Eligibility, the ALJ Decision, and Standard of Review

 Plaintiff is entitled to disability benefits when he is unable to engage in substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to either result in death or last for a continuous period of not less than

twelve months.  42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A).  The Commissioner has

established a five-step sequential evaluation process for determining whether Plaintiff is

disabled and therefore entitled to benefits.  *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v.*

*Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Plaintiff bears the burden of persuasion

through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*,

482 U.S. 137, 146 n.5 (1987).

2

On June 26, 2006, Plaintiff filed an application for disability, disability insurance benefits and on October 13, 2006, Plaintiff filed an application for Supplemental Security Income, asserting a disability onset date of July 2, 2005 (Tr. 10). Plaintiff's applications were denied initially, and he has exhausted his administrative remedies. Plaintiff/s earnings record shows that he has acquired sufficient quarters of coverage to remain insured through December 31, 2010. (Tr. 10). Plaintiff must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

The Decision of Administrative Law Judge (ALJ) Irwin Bernstein, dated May 27, 2009, denied Plaintiff's claims for disability, disability insurance benefits and found Plaintiff not eligible for Supplemental Security Income (Tr. 17). At Step 1 the ALJ found Plaintiff had not engaged in substantial gainful activity since July 2, 2005, the alleged onset date (Tr. 12). At Step 2 the ALJ found Plaintiff has the following severe impairments: 1) status post 1981 surgery to repair fractured right knee; 2) essential hypertension. (20 404.1520(c) and 416.9(c)). The medical evidence of record documents the existence of, and medical treatment for, the above-mentioned impairments. These impairments result in limitations that significantly affect Plaintiff's ability to perform basic work activities. Thus, the ALJ determined these impairments severe. (Tr. 12).

The Plaintiff has also been treated for obesity, sleep apnea, and an enlarged heart. The ALJ determined these impairments do not impact Plaintiff's ability to perform basic work activities to such an extent that they should be considered severe. Therefore, the ALJ determined Plaintiff's obesity, sleep apnea, and enlarged heart are non-severe impairments. (Tr. 12).

3

At Step 3 the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.R. Part 404, Subpart P, Appendix 1 (20 C..R. 404.1525, 404.1526, 416.925 and 416.926) (Tr. 13). At Step 4 the ALJ determined Plaintiff could not return to any of his past relevant work (Tr. 16). At Step 5, without the testimony of a vocational expert, the ALJ found Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a).

The Social Security Administration must provide evidence that other work exists in the national economy that Plaintiff can perform. The ALJ relied on Rule 201.21 of the Medical-Vocational Guidelines (Grids), found at 20 C.F.R. pt.404, subpt. P, app. 2, Table No. 1 (Tr. 17 Finding 10) to determine that Plaintiff could perform other jobs existing in the national economy in significant numbers (Tr. 17) Accordingly, the ALJ found Plaintiff was not disabled.

## II. Review of Facts and Conclusions of Law

### A. Background Facts:

Plaintiff was born on August 24, 1959, in San Juan, Puerto Rico and was 49 years of age at the time of his hearing (Tr. 17, Finding no. 7, 21). Plaintiff testified that he went to Job Core and that his last job was that of a lawn maintenance worker for approximately 5 years. Plaintiff's primary duty was to mow grass (Tr. 24). Plaintiff resides with his mother and is indigent. Plaintiff testified his mother buys his prescriptions and provides a home for him. Plaintiff has a driver's license but testified he has not driven in about 10 years (Tr. 23-25).

Plaintiff injured his right knee while playing recreational football while he was in the Job Corps.  Plaintiff's knee injury was an internal fracture in his right knee which resulted in an internal derangement of the knee and pain.  Plaintiff continued to work after surgery on his knee but continued to be bothered by the pain (Tr. 26).  By October, 2006 the pain and arthritis in Plaintiff's knee became more painful until he was no longer able to work (Tr. 26). Plaintiff testified his right knee "gave out" on him and so his employer terminated him (Tr. 13). Plaintiff deals with his knee problem by wearing a large leg brace that covers most of his knee and forces him to keep his leg straight out when sitting and by walking with a cane (Tr. 29).

Plaintiff's medical records demonstrate that he is disabled due to his knee.  Plaintiff also contends his impairments include his problems with obesity, hypertension, obstructive sleep apnea and congestive heart failure with an enlarged heart (Tr. 26). As noted above, the ALJ only found that Plaintiff's fractured right knee and his essential hypertension were severe impairments, while his obesity, sleep apnea, and congestive heart failure/enlarged heart were non-severe (Tr. 12).

On February 19, 2007, Plaintiff was seen by Robert Balbis, D.O. at Family Health Center for right knee pain.  Dr. Balbis's notes reflect that Plaintiff had not been seen for some time and had a "[h]istory of traumatic dislocation of knee in 1979 and subsequent knee surgery.  He complains of pain now".  Also noted "[n]o labs and HTN (sic) very bad today". Doctor Balbis discussed starting Plaintiff on Diovan that day, checking his labs, prescribing Ultram for pain and getting him to an orthopedist.  It was noted that "[P]laintiff will need to

5

get some money together for consult." Dr. Balbis also noted: "[P]t has screws in knee and I will defer MRI to ortho. Likely has severe arthritis due to the dislocation and many need total knee (sic)."

On March 20, 2007, Plaintiff returned to Dr. Balbis for a routine check up and a referral to an orthopedist. Dr. Balbis assessed internal right knee derangement and benign essential hypertension. Plaintiff was advised about "[m]edication administration and compliance information on the prescribed medications including, but not limited to: risks, benefits, untoward effects and alternatives was provided." (Tr. 176-177).

On March 28, 2007, Plaintiff went to Dr. Peter Curcione, D.O., for an orthopedic evaluation (Tr. 187). Dr. Curcione's evaluation indicated Plaintiff has knee problems due to an injury in the early 1980's which required reconstructive surgery of the knee. Plaintiff had intermittent knee pain, but related the last six months his pain had become more severe. Upon examination, Dr. Curcione found Plaintiff had scars around the right knee from previous surgeries and that he had limited flexion and contracture. It was noted that Plaintiff had crepitus throughout the entire range of motion of the knee and that he walked with a limp. However, Plaintiff's examination did not reveal any instability of the ligaments. Dr. Curcione's assessment was supported and consistent with x-rays of Plaintiff's right knee taken the same day, which showed "[a]dvanced wear of the right knee with significant medial compartment bone-on-bone arthrosis (Tr. 188)." Based upon his evaluation and examination of Plaintiff, Dr. Curcione concluded Plaintiff would be a good candidate for vocational rehabilitation and if his knee problems could be remedied with a total knee replacement, he might well able to re-enter the labor force (Tr. 187).

On January 31, 2007, Plaintiff was seen by Dr. S. V. Nagarathinam, M.D., an internist, at the request of the Commissioner (Tr. 163-164). In his report, Dr. Nagarathinam noted that Plaintiff had been a smoker for 30 years, that he had a ninth grade education, and his past employment was as a lawn maintenance worker (Tr. 163).  Plaintiff revealed he lost his job because he was unable to "stand" and could not perform his duties as required.

 Medically, Dr. Nagarathinam wrote that Plaintiff had suffered a closed fracture of the right knee in the 1980's and that the knee had been surgically repaired.   He noted that after discharge from the hospital Plaintiff used a cane when  walking. Dr. Nagarathinam wrote Plaintiff did not go back to work for 18 months after the initial operation and since the operation, Plaintiff had only been able to work part-time jobs. Additionally, it was noted that Plaintiff's knee is stiff in the morning and that he has no feeling over the kneecap. Plaintiff told Dr. Nagarathinam that his knee "gives up on him at times." (Tr.163). Plaintiff advised that occurs when he stands or walks for more than one-half  hour.

Dr. Nagarathinam noted Plaintiff had developed varicose veins over his right lower leg, but no edema or tenderness, and that peripheral pulses were good.  Plaintiff's blood pressure was 170/100 mm. Hg. and his height was 5' 2" and his weight 273 pounds (Tr. 163). Examination revealed that his abdomen was soft and obese. Plaintiff's right knee revealed a scar  well healed, with no joint effusion, normal range of motion, and no crepitus. Plaintiff's gait was normal and that he did not use any device for ambulation. The examination did not reveal any spinal problems, functional problems with Plaintiff's hands

7

or motor deficits in his extremities (Tr. 164).  Dr. Nagarathinam recorded his diagnostic

impressions as "[s]tatus post surgery for fracture of the right knee with varicose veins over

the right leg and exogenous obesity (Tr. 164)".

Finally, Dr. Nagarathinam completed a Range of Motion Report Form for the

Division of Disability Determinations. While typically numerical values of a patient's actual

range of motion (i.e. cervical spine, lateral flexion, lumbar spine, etc.)  are inserted in the

blanks on this form, the form completed by Dr. Nagarathinam contained no numerical

values, only the word "normal" stamped in every blank (Tr. 165-167).

On March 12, 2008, Plaintiff went to the Family Health Center complaining of

difficulty  breathing, especially at night. Dr. Balbis noted that Plaintiff was not taking

his medication and his weight was 294 lbs. His blood pressure was 175/100 mm. Hg. Dr.

Balbis's assessment was that Plaintiff was suffering from benign essential hypertension**.** (Tr.

244-245).  Plaintiff's medications were refilled and he was scheduled for a re-check visit in

one week.  (Tr. 244).

On November 22, 2008, Plaintiff went to the Emergency Room (Lehigh Regional

Medical Center) (Tr. 198).  Plaintiff stated he fell while getting out of a car when his knee

gave out. Examination revealed tenderness and pain in both the anterior and lateral ligaments

as well as a popping sensation in his right knee (Tr. 198). Plaintiff  was able to walk but was

limited by pain. Plaintiff was diagnosed with internal derangement of the right knee (Tr.

199). The x-ray taken that day of his right knee revealed "hypertrophic degenerative

change." "[T]here is mild loss of cartilage space in the medial joint compartment with

subchondral sclerosis.  There are tiny spurs involving the patella.  There is no bursal effusion

8

or fracture. "  This x-ray was consistent with osteoarthritis of the right knee (Tr. 200).

Plaintiff was given Percocet and a knee immobilizer and instructed to see Dr. Curcione (Tr.

199).

On January 12, 2009, Plaintiff was admitted to Lehigh Regional Medical Center

for shortness of breath, fever and chills. Plaintiff was described as morbidly obese with

blood pressure of 140/65, decreased breath sounds throughout with occasional wheezing.

(Tr. 202, 203).  Plaintiff's chest x-ray revealed mild congestive heart failure. (Tr. 203).

While in the hospital Plaintiff underwent a series of tests including a stress test, an

echocardiogram, a scan of the venous system of his lower extremities and he was scheduled

for a heart catherization. The stress test was positive for ischemia (Tr. 204). The echo-

cardiogram performed on January 13, 2009, revealed mild left ventricular enlargement,

hypertrophy of the left ventricle, trace mitral regurgitation, and a slightly abnormal ejection

fraction at 47% (Tr. 226). The scan of the venous system of his lower extremities was

normal (Tr. 227). A subsequent chest x-ray showed an enlarged heart (Tr. 228). Discharge

diagnoses were obstructive sleep apnea, congestive heart failure, metabolic syndrome, chest

pain, hypertension, and abnormal stress test (Tr. 202). Plaintiff was  discharged on January

15, 2009, with the following medications:  HCTZ, Lisinopril, K Dur, Prednisone, Albuteral

inhaler, and Coreg (Tr. 235).

On January 24, 2009, Plaintiff returned to see Dr. Curcione. Plaintiff related that his

knee had given out while walking approximately two weeks earlier (Tr. 240).  Plaintiff

complained of deep sharp stabbing pain inside the knee with stiffness and a feeling of

instability in the knee. Plaintiff had been treated previously with cortisone injections and

knee immobilization (Tr. 240). At the time of this examination, Plaintiff denied any respiratory complaints including shortness of breath; (this appointment followed his treatment for shortness of breath and his hospitalization for congestive heart failure). At the time of this examination, blood pressure was 142/96 mm. Hg. and his weight was 275 lbs. (Tr. 241). A physical examination of the right knee indicated tenderness and swelling. There was crepitus present and Dr. Curcione noted Plaintiff had become "bowlegged" due to his injury. (Tr. 241)

With respect to range of motion, he found his extension to be 5 degrees and his flexion to be 110 degrees. [1] Dr. Curcione also performed both the McMurray and the Steinman tests which determine whether there are tears in the meniscus and determines knee flexion and they were both positive (Tr. 242).[2] Plaintiff was also observed walking with a limp. Plaintiff was instructed to call the office if necessary, medications were refilled and total knee replacement was recommended (Tr. 242).

On January 27, 2009, Dr. Curcione completed a Physical Capacity Evaluation (PCE) form (Tr. 236-237). On this "PCE" form, Dr. Curcione opined Plaintiff could not stand or walk for any period during an 8 hour workday.[3] With respect to sitting, he noted Plaintiff could sit for 1 hour at a time for a total of 2 hours during an 8 hour day. He also opined Plaintiff could lift up to 10 lbs. on an occasional basis. He did not place any restrictions on either the use of the hands or repetitive use of the feet for foot controls (Tr. 236-237). As

---

[3]     Normal range of motion for flexion of the knee is 0-150 degrees. Extension is 0 degrees. (Tr. 166).

pertains to postural limitations, he found Plaintiff was unable to bend, squat, crawl, or climb (Tr. 237). In the remarks section of his evaluation, Dr. Curcione wrote the following:

> "His R-knee is very badly arthritic & prevents him from any employment. He is a laborer with no other skills. He needs a knee replacement." (Tr. 237) .

Plaintiff was seen by two State medical examiners. Brian Pulling completed the Physical Residual Functional Capacity Assessment on February 7, 2007, and his review was consistent with a "RFC" of a sedentary work level. However, his opinion was not referenced by the ALJ (Tr. 168-175).

Dr. Francis Klingle, M.D., completed the Physical Residual Functional Capacity Assessment on May 5, 2007 (Tr. 189-196). Dr. Klingle's review was consistent with a limited range of light work. Specifically, he stated Plaintiff was capable of performing light work provided the postural activities of climbing stairs or ramps, balancing, stooping, kneeling, crouching and crawling were performed only on an occasional basis (Tr. 190-191). He stated Plaintiff should avoid concentrated exposure to hazardous machinery and heights (Tr. 193). Dr. Klingle's opinion was referenced by the ALJ and was given "considerable weight". (Tr. 14-16)

**B.      SPECIFIC ISSUES:**

**(1)      THE ALJ'S "RFC" IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

The record shows the ALJ weighed the medical opinions of Dr. Nagarathinam and Dr. Curcione, the two examining physicians, and Dr. Klingle, the non-examining physician (Tr. 15). The ALJ gave Dr. Nagarathinam's opinion "great weight"; Dr. Klingle's "considerable weight" and Dr. Curcione's only "modest weight." (Tr. 14-16). Dr. Curcione,

the orthopedist who examined Plaintiff in 2007 and again in 2009 was accorded the lowest weight of the three physicians.

The ALJ gave Dr. Nagarathinam "great weight," because he had actually examined Plaintiff, was familiar with Social Security disability standards and "provided an unbiased assessment" of Plaintiff's condition. Dr. Klingle's opinion was given "considerable weight" "because Dr. Klingle is a medical doctor who examined all of the medical evidence of record**.**" (Tr. 15). The ALJ found that Dr. Nagarathinam's opinion was"fully supported" by Dr. Klingle's Physical Residual Functional Capacity Assessment because Dr. Klingle also agreed Plaintiff was capable of performing light work, but could only perform the postural activities of climbing, balancing, stooping, kneeling, crouching and crawling on an occasional basis (Tr. 14, 15, 193). Dr. Klingle also agreed with Dr. Nagarathinam's opinion that Plaintiff should avoid concentrated exposure to hazardous machinery and heights (Tr. 15, 193). Thus, after reviewing Dr. Klingle's physical capability assessment (finding Plaintiff's "RFC" to be light work), the ALJ reduced Plaintiff's "RFC" to sedentary because of Plaintiff's postural limitations. (Tr. 15).

Plaintiff argues that in formulating this sedentary "RFC", the ALJ committed several errors. Dr. Klingle rendered his report May 1, 2007, more than 2 years prior to the ALJ's Decision in this case (Tr. 196). Dr. Klingle's report was completed prior to Plaintiff's second visit with Dr. Curcione, who once again recommended a total knee replacement based on objective medical testing including range of motion tests and x-ray imaging demonstrating severe degenerative disc disease and arthritis in Plaintiff's knee. The report also pre-dated Plaintiff's November 22, 2008 trip to the Emergency Room after Plaintiff fell getting out of

a car due to weakness in his arthritic knee.  The x-rays taken in the ER revealed "hyper-
trophic degenerative change, mild loss of cartilage space and tiny spurs involving the
patella". (Tr. 198, 199, 200). The report also pre-dated Plaintiff's January 15, 2009  return to
the Lehigh Regional Medical Center where his chest x-ray "was consistent with mild
congestive heart failure and stress test was positive for ischemia."  (Tr. 200-203).

     Thus, the "RFC" based on the reports of Dr. Klingle (non-examining physician) and
Dr. Nagarathinam could not have been based upon all of the evidence. (SSR 96-8p advising
that the "RFC" assessment must consider all relevant evidence, including medical history,
medical evaluations, daily activities, and lay evidence). (20 C.F.R. §§404.1520(a)(3),
416.920(a)(3) ("We will consider all evidence in your record when we make a determination
or decision whether you are disabled.").  *Frankl v. Shalala*, 47 F3d. 935, 938, (8th Cir., 1995)
(an ALJ cannot rely upon a non-examining physician's "RFC" when the "RFC" was
completed almost a year prior to the hearing and therefore was not based on the full record),
see also, *Parker v. Astrue,* 2010 WL 3089034 *7 (N.D. Fla. July 2, 2010).

     The ALJ  erred in evaluating and weighing the opinions of the doctors in this case.
The regulations governing the weighing of medical opinions are found at 20 C.F.R.  §§
404.1527(d), 416.927(d). These regulations clearly state that the following factors are to be
taken into consideration when evaluating medical opinions: (1) the examining relationship,
(2) the treatment relationship including consideration of the length of the treating
relationship, the frequency of examination and the nature and extent of the treatment
relationship, (3) the supportability of the opinion using medical signs and laboratory
findings, (4) consistency with the record as a whole, (5) specialization, and (6) other factors.

13

In the instant case, the ALJ accorded more weight to both Drs. Nagarathinam and Dr. Klingle than he accorded to Dr. Curcione.  In applying the regulation to Dr. Curcione, the ALJ wrote that he assigned Dr. Curcione only "modest weight" because Dr. Curcione (although he personally examined Plaintiff), was not Plaintiff's treating physician and therefore found his opinion did not merit the deference allowed to be accorded a treating physician by SSR 96-2p.  The ALJ also determined Dr. Curcione's opinion 'that Plaintiff is disabled because of his arthritic knee' is an issue reserved to the Commissioner. (SSR 96-5p).  The ALJ wrote:  "[A]s previously stated in this decision, it appears that Dr. Curcione's specialty in orthopedics has a strong bearing on his opinion that Plaintiff is disabled due to his knee problem".  "... absent from Dr. Curione's treatments notes is any concern for on-going treatment, therapy, or medications that may benefit Plaintiff (Tr. 16)".

Dr. Curcione's treatment notes clearly indicate Plaintiff had undergone cortisone shots and was provided a knee mobilizer.  Further, that Plaintiff would benefit from having knee replacement surgery (Tr. 240-242). Dr. Cucione examined Plaintiff and noted limping. The medial McMurray's test was positive and the medial Steinman test was positive. Plaintiff was found to be credible for pain and prescribed Percocet. (Tr. 241-242) Dr. Curcione's findings were consistent with the medical evidence of record and revealed a degenerative knee condition and arthritis (Tr. 188, 200). He is also a specialist in orthopedics (Tr. 16, 163).

The Court finds the ALJ's decision is not supported by substantial evidence and Dr. Curcione's opinion is entitled to greater weight because he was the "examining physician", an orthopedic specialist and his conclusions were supported by objective medical evidence.

14

**(2)     THE ALJ ERRED BY FINDING SOME OF PLAINTIFF'S IMPAIRMENTS "NON-SEVERE".**

The Plaintiff argues that the ALJ erred by finding some of Plaintiff's impairments "non severe." (Tr. 12).  Specifically, he found Plaintiff's obesity, sleep apnea and enlarged heart to be "non-severe." (Tr. 12). An impairment is "non-severe" only if the abnormality is so slight and its effects so minimal that it would clearly not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience. *McDanielv. Bowen*, 800 F.2d 1026 (11th Cir. 1986).  The ALJ had a duty to consider all of Plaintiff's impairments in combination, both severe and non-severe. The regulations require the ALJ to consider the combined effect of a Plaintiff's impairments, even when those impairments are considered to be non-severe when considered separately. 20 C.F.R. §§ 404.1523, 416.923 (the Commissioner will consider the combined effect of all Plaintiff's impairments with regard to whether any such impairment, if considered separately, would be of sufficient severity) Additionally, 20 C.F.R §§ 404.1545(e), 416.945(e) (the Commissioner will consider the limiting effect of all of a Plaintiff's impairments, even those that are non-severe).

Specifically, the ALJ  failed to discuss Plaintiff's obesity. The record is replete with references to his obesity. At various times, he is referred to as "obese," "morbidly obese," and has been diagnosed with "exogenous obesity." (Tr. 164, 240 ). Plaintiff 's height is 67 inches and his weight (in pounds) has been recorded over a portion of the relevant time period [approximately May 2006 –November 2009] (Tr.  176,191, 200, 241, 244). Yet, the ALJ failed to discuss how Plaintiff's obesity affected his other impairments.

15

In SSR 02-1p: Policy Interpretation Ruling Titles II and XVI: Evaluation of

Obesity, the Commissioner states that "the combined effects of obesity with other

impairments can be greater than the effects of each impairment considered separately."

Obesity is a medically determinable impairment that should be considered not only at step

three, the listings level, but also "when assessing an individual's residual functional

capacity." (SSR-02-1p). For Social Security purposes, obesity is measured in terms of the

Body Mass Index (BMI). A BMI of 40 or over is clinically considered the most severe level

of obesity (SSR 02-1p). Throughout the record, Plaintiff is listed to have a BMI in excess of

40 (Tr. 176, 244). While no particular level of obesity is required to qualify as a "severe

impairment," the ALJ is required to assess non-severe impairments.

Obesity is often associated with hypertension, sleep apnea and heart disease –all

impairments which Plaintiff has which were ruled non-severe. Additionally, obesity often

increases pain in people who have problems in weight bearing joints. (SSR-02-1p). In

this case, Plaintiff had a knee which needed replacement and complained of constant pain

in the knee and there is no express articulation that the ALJ took into account the effect

of obesity on Plaintiff's knee These non-severe impairments were not addressed by the ALJ.

The Court finds that substantial evidence is provided in the record regarding

Plaintiff's non-severe impairments and should have been specifically addressed by the ALJ.

**(3)     THE ALJ ERRED BY FAILING TO EVALUATE THE
         PLAINTIFF'S SUBJECTIVE COMPLAINTS OF PAIN.**

The ALJ is required to evaluate Plaintiff's subjective complaints of symptoms

including pain. 20 C.F.R. §§ 404.1529(a)416.929(a), SSR 96-7P. In evaluating symptoms,

the regulations provide that a claimant's statements about pain or other symptoms will not

alone establish disability. 20 C.F.R. §§ 404. 1529(a), 416.929(a). Rather, medical signs and

laboratory findings must be present which show a medical impairment(s) which could

reasonably be expected to produce the symptom(s) alleged. 20 C.F.R. §§ 404.1529,

416.929(a). The standard for evaluating pain in the Eleventh Circuit requires,

> (1) evidence of an underlying medical condition and either (2) objective
> medical evidence that confirms the severity of the alleged pain arising from
> that condition or (3) that the objectively determined medical condition is of
> such severity that it can reasonably be expected to give rise to the alleged
> pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Where an ALJ decides not to credit a

claimant's testimony about pain, the ALJ must articulate specific and adequate reasons

for doing so, or the record must be obvious as to the credibility finding. *Foote v. Chater*,

67 F.3d 1553, 1561-62. As a matter of law, the failure to articulate the reasons

discrediting subjective pain testimony requires that the testimony be accepted as true.

*Cannon v Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988). Furthermore, the reasons given for

discrediting a Plaintiff's pain testimony must be based on substantial evidence. *Jones v.

Dep't of HHS,* 941 F2d 1529, 1532 (11th Cir., 1991).

Plaintiff is 5'6" tall and weighs 286 pounds.  Plaintiff estimated he can walk about 3

blocks, stand for 15-20 minutes and sit for about 30 minutes.  Further, he can only lift 10-15

pounds; can bend but not knee and cannot walk without his leg brace and using his cane for

ambulation.   Plaintiff testified that his daily activities consisted of eating and watching

television and that he goes swimming 1-2 times a month.  The ALJ found that Plaintiff had a

medically determinable impairment which could cause pain, but that the Plaintiff's

statements regarding the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ALJ's "RFC" of sedentary. (Tr. 13-14).

In this case, the ALJ focused more on credibility than pain. With respect to Plaintiff's pain, the ALJ found that Plaintiff had a medically determinable impairment which could cause pain, but that the Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC (Tr. 14). First, the ALJ focused in on the confusion of the date of onset (July 2005) and Plaintiff's testimony that he had worked beyond the onset date in 2006. The ALJ implied that since no explanation was given, Plaintiff was not credible (Tr. 14). While the ALJ stated that "no explanation" was given, the ALJ found Plaintiff had not engaged in Substantial Gainful Employment ("SGA") which would seem to explain the discrepancy and not be inconsistent with working part time and being fired.

As to the hearing, several discrepancies arose which appear to be more problems with communication than actual discrepancies that should be used to discredit Plaintiff's pain testimony.[4] With respect to Plaintiff's pain, he told Dr. Nagarathinam that his leg is stiff in the morning, and that he has no feeling in his knee cap (Tr. 183). In his pain

---

[4]     There are two confusing exchanges between the ALJ and Plaintiff on page 23.
       1) the issue of Plaintiff's driver's license and not driving for 10 years 2)
       Plaintiff's level of education. While trying to figure out the driving issue, the
       ALJ summed up things as:" Q: He doesn't understand. I speak Spanish, he don't
       [sic] understand Spanish, and I don't understand his English. We're doing great.
       You haven't driven a car in ten years?" Later, still trying to unravel the license
       and driving question, the ALJ stated, "I give up. I give up. Okay. What grade did
       you go to in school." (Tr. 23).

questionnaire completed on December 18, 2006, he stated that pain interfered with his ability to cook, his sleep, and that he could not perform yard work (Tr. 123). He testified that his daily activities consisted of eating and watching TV, and that he needs a cane to ambulate (Tr. 15, 28-29). None of these activities belie the fact that Plaintiff is not limited by pain, especially when his arthritis has been verified by objective studies, and the limitations placed upon him by Dr. Curcione. The record reveals that Plaintiff has been given a knee immobilizer, prescribed Percocet, and endured cortisone shots. In a disability report, he stated that it was difficult to get into and out of a tub and put his pants on due to the fact that his knee can bend –"only so far." (Tr. 146). To the extent that Drs. Nagarathinam and Klingle's opinions are arguably inconsistent with the severity of pain, these opinions are outdated as outlined above.

The ALJ is required to evaluate Plaintiff's subjective complaints of symptoms including pain. Therefore, the ALJ's decision is not supported by substantial evidence.

### 4. THE ALJ ERRED IN USING THE GRIDS.

In the Eleventh Circuit, "[e]xclusive reliance on the grids is not appropriate either when claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills." *Francis v. Heckler,* 749 F.2d 1562, 1566 (11th Cir. 1985). Plaintiff had the non-exertional impairment of extreme pain and postural limitations as well as needing to avoid concentrated exposure to hazardous machinery. Here, the ALJ stated that he reduced Plaintiff's "RFC" from light to a full range of sedentary work because of Plaintiff's postural limitations (Tr. 15). In this paragraph explaining his "RFC", he noted that Dr. Klingle had

opined that Plaintiff have only limited exposure to hazardous machinery (Tr. 15). While the work related activities differ between light and sedentary work, the fact remains that if Plaintiff has postural limitations at light work, he also has those limitations at sedentary work. They do not change merely because the level of work has changed. Section 201.00 of the Grids states that of the 200 sedentary jobs encompassed by the Grids, fully 85% of them involve machine trades and bench work. Hence, a limitation to avoid concentrated exposure to machinery would substantially reduce the occupational base and consultation with a VE would be appropriate.

Further, pursuant to SSR 83-12, Plaintiff's need to alternate sitting and standing, in itself, is a significant non exertional limitation which requires vocational expert testimony. The ALJ"s conclusion that Plaintiff was capable of performing limited work activities at the sedentary exertional level clearly excludes reliance on the Grids, as exclusive reliance on the Grids is prohibited where Plaintiff cannot perform the full range of work at a given functional level on a sustained basis.  In the instant case, there is a reasonable possibility that a proper analysis of Plaintiff's non-exertional impairments would change the administrative results   Thus, the ALJ failed to apply the correct legal standards in evaluating Plaintiff's case.

### C.      CONCLUSION

For the foregoing reasons, the ALJ's decision is inconsistent with the requirements of law and not supported by substantial evidence.

 It is hereby **ORDERED** that the decision of the Commissioner be  **REVERSED** and **REMANDED** pursuant to 42 U.S.C. § 405 (g) to allow the Administrative Judge to:

(1)     Reconsider the findings of the examining and non-examining physicians.

(2)     Consider evidence relevant to the Plaintiff's non-severe impairments.

(3)     Consider evidence relevant to Plaintiff's severe and non-severe impairments **in combination** to properly consider the limitations of Plaintiff performing sedentary work.

(4)     Conduct a hearing to consult with and elicit testimony from a vocational expert to properly consider Plaintiff  performing sedentary work on a regular and sustained basis.

(5)     Determine  the availability of suitable alternative jobs in the local and national economy based on the above-mentioned impairments.

**DONE and ENTERED** in Chambers at Fort Myers, Florida, this 12th  day of November 2010.


DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE



The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:
All Counsel of  Record

21